# THE CANTON COMPANY OF BALTIMORE *vs.* THE BALTIMORE AND OHIO RAILROAD COMPANY.

*Abandonment of Right of Way by Railroad Company After Condemnation—Reverter of Land to Owner—Mere Non-User Not ˙Abandonment— Taking by One Railroad Company of Right of Way Formerly Condemned˙by Another Company.*

When a railway company has condemned a right of way and paid for the same, the mere non-user of that route and the use of another, do not show an abandonment of such right of way so as to cause the land condemned to revert to the original owner.

In order to constitute an abandonment by a railway company of a right of way, there must be both an intention to abandon and the external acts by which that intention is carried into ˙effect.   Non-use of the right of way and the use of another route are evidence of abandonment but do not establish same as matter of law in all cases.

In 1885, the Balto. & Ohio R. Co., proposed to connect its terminal in Baltimore City with its Philadelphia division by a certain route which crossed the property of The Canton Company, and in that year condemned a strip of the latter's land, paid the damages awarded therefor; entered into possession and˙ laid rails, but did not use the same. The condemnation was for the use in perpetuity of the land for the Philadelphia division.   This contemplated connection was not then completed on account of financial difficulties, but the railroad company used another route to connect with˙the Philadelphia division until 1895, ˙when the connection was made by means of the Belt Line Tunnel under the city and the railroad company agreed with the Belt Line Company to ship through the tunnel all of its traffic passing through the city and guaranteed payment of the Belt Line bonds.   This traffic has since been so shipped.   The Canton Company brought this action of ejectment, to recover possession of the land so condemned, alleging that it had˙been abandoned by the railroad company, and that consequently it reverted to the plaintiff.   The defendant's evidence showed that the capacity of the tunnel is now taxed to the utmost and that it will become necessary to transport freight through the city by the route so condemned or some other one.   *Held*, that these facts do not establish, as matter of law, that the defendant had abandoned the right of way over the land condemned so as to cause a reversion thereof to the plaintiff, there being no evidence of an intention to abandon, and the use of the tunnel not being inconsistent with the purpose at some future time of using another line for making an additional connection with the Philadelphia division.

*Held*, further, that the defendant's agreement with the Belt Line to send all its through traffic over the latter's route does not express an intention to abandon the route over the plaintiff's land or prevent defendant from using other means of transportation for such traffic as may be in excess of the capacity of the Belt Line to carry.

The Act of 1890, ch. 220, provides that whenever upon an unfinished railroad, a right of way or location on any part thereof, remains for ten years, unused for railroad purposes, the same shall be held to be abandoned and shall be liable to be used and appropriated by another rail road company, upon purchase or condemnation, *Held*, that this statute does not apply to the claim of the plaintiff to a reversion of the land condemned in this case, but the statute was intended to authorize another railway company to condemn, for its use, a right of way, previously acquired by the company, which had made no use thereof for more than ten years.

Appeal from the Circuit Court for Baltimore County (BURKE, J.)

*Plaintiff's 1st Prayer.*—If the Court shall find from the evidence that subsequent to the condemnation proceedings in the case of *The Baltimore and Ohio Railroad Company* v. *The Canton Company of Baltimore et al.*, the Baltimore and Ohio Railroad Company entered into the agreement dated January 6th, 1890, with the Baltimore Belt Railroad Company, a certified copy of which has been offered in evidence, and that in accordance therewith and subject to the conditions thereof, the Baltimore and Ohio Railroad Company now ships and causes to be transported and carried and has since the year 1895 shipped and caused to be transported and carried over the line of the Baltimore Belt Railroad Company its passenger and freight traffic passing between Baltimore and its Philadelphia division (with the exception testified to by the witness Potter), and that none of the said traffic has been or is transported over the parcel of land described in the declaration, and that the legal title to the parcel of land described in the declaration is and has been since the execution of the patent from the State of Maryland offered in evidence, in the plaintiff, and that on or about the 15th day of April, 1900, the defendant entered the said parcel of land in the manner described in the declaration and in the evidence, then the

plaintiff is entitled to a verdict and to a judgment for the re-
covery of the said parcel of land and for the damages by it
sustained from the wrongful acts of the defendant aforesaid.
(*Refused.*)

*Plaintiff's 2nd Prayer.*—The plaintiff prays the Court, sit-
ting as a jury, that if it believes from the evidence in this
cause, that the property described in the declaration was con-
demned by the defendant under the condemnation proceedings
offered in evidence, for the purposes in said condemnation pro-
ceedings set out, and that the right of way over said property
so condemned remained unused for railroad purposes for ten
or more years after such condemnation, the plaintiff prays the
Court to find that the said right of way was abandoned by the
defendant, and its title to the same, as derived through said
condemnation proceedings, has lapsed.  (*Refused.*)

*Plaintiff's 3rd Prayer.*—The plaintiff prays the Court, sit-
ting as a jury, that if it finds that the defendant condemned,
under the condemnation proceedings offered in evidence, an
easement or right of way over the property described in the
declaration, for the purposes of a railroad, and at the time of
such condemnation the property in question belonged to the
plaintiff, in fee-simple, and shall further find that the plaintiff
had not at the time of the institution of this suit sold or other-
wise disposed of any of its rights, title or interest in and to
said property, and has not since done so, and that since such
condemnation, the defendant has adopted another and differ-
ent route for the transportation of its freight and passengers,
and has never completed its railway over the property so as
aforesaid condemned, then the plaintiff prays the Court to find
that the right of way so as aforesaid condemned was aban-
doned by the defendant, and that all rights of the defendant
so acquired by such condemnation have reverted to the plain-
tiff; and if the Court shall further find that the defendant has
entered upon said property and now occupies the same, with-
out other claim of title than that derived through said con-
demnation proceedings, then the plaintiff is entitled to recover
the possession of said property named in this suit, together

with such damages as the Court may find the plaintiff to have suffered by reason of such entry and occupation. (*Refused.*)

*Plaintiff's 4th Prayer.*—If the Court shall find from the evidence that subsequent to the condemnation proceedings in the case of the *Baltimore and Ohio Railroad Company* v. *The Canton Company of Baltimore et al.* The Baltimore and Ohio Railroad Company entered into the agreement dated January 6th, 1890, with the Baltimore Belt Railroad Company, a certified copy of which has been offered in evidence, and that none of the passenger or the freight traffic passing between Baltimore and the Philadelphia division of the defendant, has been or is transported over the parcel of land described in the declaration, and that the legal title to the said parcel of land is and has been, since the execution of the patent from the State of Maryland offered in evidence, in the plaintiff, and that on or about the 15th day of April, 1900, the defendant entered the said parcel of land in the manner described in the declaration and in the evidence, then the plaintiff is entitled to a verdict and to a judgment for the recovery of the said parcel of land and for the damages by it sustained from the wrongful acts of the defendant aforesaid. (*Refused.*)

*Defendant's 1st Prayer.*—The defendant prays the judgment of the Court that the plaintiff has offered no evidence legally sufficient to enable it to recover under the pleadings in this cause, because it has shown no abandonment of the intention to use the land in controversy for the purpose for which it was condemned, and therefore the finding of the Court sitting as a jury should be in favor of the defendant. (*Refused.*)

*Defendant's 2nd Prayer.* The defendant prays the Court to rule as matter of law, that if the Court sitting as a jury shall find from the evidence in the case that the land described in the plaintiff's declaration is a portion of the land described in the condemnation proceedings given in evidence, and that upon judgment being given upon the award for damages given by the jury in such condemnation proceeding, the Baltimore and Ohio Railroad Company did satisfy such judgment by paying to the then owner of the land so condemned, towit, the plain-

tiff in this case the full amount so awarded by the jury, and that the defendant has all the time since held the title to said land so acquired, then the plaintiff is not entitled to recover in this action although the Court may further find as matter of fact that the defendant has never utilized or used said land for railroad purposes, provided the Court shall find that such non-user for railroad purposes was not in pursuance of an intention on the part of the defendant company to abandon the land so acquired under said condemnation proceeding. (*Granted.*)

The cause was argued before McSherry, C. J., Fowler, Briscoe, Page, Pearce, Schmucker and Jones, JJ.

*Arthur Geo. Brown* and *T. Wallis Blakistone*, for the appellant.

The appellant's case is based on the well-recognized principle that when a corporation in the exercise of the right of eminent domain, acquires for a public purpose an easement in land, its right and title to the property so acquired are dependent upon the use of the property for public purposes, and when such public use ceases or is abandoned its right to hold the land ceases, and the property reverts to the original owner. 10 *Am. & Eng. Ency. of Law* (2nd ed.) 1198, 1203.

The making of the perpetual traffic agreement by the B. & O. R. R. with the Belt Line constituted an abandonment in law of the right of way which had been condemned through the appellant's land, as part of the plan for the location of the Philadelphia branch upon the other route, which was in contemplation at the time of the condemnation.

The reason for the rule is clear. The right of eminent domain is an extraordinary power, and can only be used by certain classes of *quasi* public corporations for the benefit of the public. When the power is exercised by a railroad company for the purpose of acquiring a right of way over the land of an individual, the easement acquired merely gives to the railroad company the right to use the lands for its purposes. The former proprietor of the soil still retains the fee of the land

and his right to the land for every purpose not incompatible with the rights of the railroad company. Yet upon the discontinuance or the abandonment by the railroad company of its easement in the land for the purposes for which it was condemned, the land is freed from the rights of the railroad company to use the property, and the entire and exclusive property and right of enjoyment is re-vested in the owner of the fee. The owner has never received compensation for the value of the fee in the property, and, therefore, to deprive him of his right to the reversion and hold that the entire property passed to the corporation would be to deprive him of his property without compensation.

The property right of the holder of a right of way does not attach to the land, independent of, and disconnected from, its use for public purposes. The occupancy and public use, must run together. If the public use becomes impossible or is abandoned, the right to hold the land ceases. Corporations and individuals cannot acquire easements and never use them, yet hold the land upon which they are located. When there ceases to be an easement, there ceases to be anything which the claimant of the easement can hold. The very thing which he acquires has vanished, and he ceases to hold any property, for the subject of the property no longer exists. The appellant's (plaintiff's) first, third and fourth prayers are based on similar principles.

The authorities hold that when a railroad company has originally adopted and established a given line of railroad, and subsequently changes the location of its route, such change and the adoption of the new route work an abandonment *in law* of the former route. In *Stacy* v. *Vermont Central Railroad*, 27 Vt. 39, an action was brought by the owner of certain land which had been condemned by the railroad company to recover the amount of the damages awarded by the condemnation jury. The survey of the road was made on June 4th, 1847, and was recorded in the clerk's office on August 5th, 1847. The appraisal of damages by the jury was made on January 5th, 1849, and was recorded on the 5th of

February following.   In February, 1850, the railroad company changed their line of road by locating the same on other land than that of the plaintiff upon which their road had been constructed.   The Court said:  "That change in the line of their road, however, will operate as an abandonment of their former survey on the plaintiff's land, so that the company can no longer claim any right or interest in the land itself, or to any easement growing out of it, in consequence of that survey having been made.

In *Comm.* v. *Westborough*, 3 Mass. 406, it was said in regard to the alteration of the location of a highway "establishing an alteration in a way is, in law, a discontinuance in the part altered."   And again, in *Comm.* v. *Cambridge*, 7 Mass. 163, which was the same kind of a case, "it has been decided that an alteration in the course of an existing road is, *in law*, a discontinuance of so much of the existing road as the course of it had altered."   See also *Hickox* v. *R. R. Co.*, 78 Mich. 615; *Same* v. *Same*, 94 Mich. 237; *Wood on Railroads* (Minor's ed.), 889, 891 and 892; *Kane* v. *Baltimore*, 15 Md. 240; *Taylor* v. *Baltimore*, 45 Md. 576; *Hooker* v. *Turnpike Co.*, 12 Wendell, 373; *Mills on Eminent Domain*, sec. 57; *Randolph on Eminent Domain*, sec. 218; *Phillips* v. *Dunkirk R. Co.*, 78 Pa. St. 177; *Comm.* v. *Boston, &c., R. Co.*, 150 Mass. 176; *Rorer on Railroads*, 279, 440.

We contend that when the Baltimore and Ohio Railroad agreed with the Belt Line to transport all of its traffic passing through Baltimore and destined to and from points on its Philadelphia division it abandoned, *in law*, its right to hold the easement over the land of the appellant.   It was pointed out in the statement of facts that when the right of way was condemned over the land of the appellant, the Baltimore and Ohio Railroad was building its Philadelphia division.   That the road which it was then building was finally completed in 1886, and ran from Third avenue, Canton, past Bayview Junction to Philadelphia.   Trains were operated over this line by means of the ferry from Locust Point up to the time the Belt Line was finally opened on August 4th, 1895.   During all of this

CANTON CO. vs. BALTO. & OHIO R. CO.   209

Md.]                    Argument of Counsel.

time no real, substantial work was ever done toward the completion of the contemplated line along Pratt street. Some property had been condemned in 1885 looking towards the carrying out of this route, and some temporary track was laid over a portion of the land belonging to the appellant. But nothing more was ever done. In 1890, the Baltimore and Ohio Railroad entered into the agreement with Belt Line which was to be in force for 999 years, and as a part of the consideration for the Belt Line building its road, the Baltimore and Ohio Railroad agreed, during the continuance of the agreement, to transport over the Belt Line "*all of its traffic of every kind* passing through Baltimore." It was also part of the agreement that the Baltimore and Ohio Railroad would pay to the Belt Line an annual sum of money which would be sufficient to pay the interest on the first mortgage bonds of the Belt Line Company. This agreement renders it impossible for the Baltimore and Ohio Railroad to adopt or use the Pratt street route. The agreement mentioned above was incorporated into the mortgage given to secure the bonds of the Belt Line Railroad. Even if the Baltimore and Ohio Railroad should desire to adopt for the use the Pratt street route, the bondholders, by virtue of this agreement and the Baltimore and Ohio's guarantee of the bonds, could insist that it transport all of its traffic passing through Baltimore over the Belt Line.

The question objected to requested Mr. Mayer to state whether, *at the present time*, it would be proper for the Baltimore and Ohio Railroad to abandon its projected line through the city. The issue in this case was whether the Baltimore and Ohio Railroad *had ever*, between the time of the comdemnation proceedings and the time of its wrongful entry on the lands of the appellant, on April 15th, 1900, *abandoned* the projected line of which the right of way in controversy was to form a part. Whether it would be a wise or foolish thing for the Baltimore and Ohio Railroad to abandon the old and unused Pratt street project if it were a practical question at the present time, could not help to determine the question whether

or not the railroad company had in law and in fact abandoned the right of way in controversy prior to April 15th, 1900. If the appellant's foregoing contentions are correct, it necessarily follows that its special exception to the second prayer offered by the appellee, was well taken and should have been sustained.

*John I. Yellott* and *W. Irvine Cross* (with whom was *H. L. Bond, Jr.*, on the brief,) for the appellee.

The Act of 1890, ch. 220, was intended to prevent a railway company from holding indefinitely a right of way without user, and thereby preventing another company from constructing a road when the public interests demanded. The terms of the Act exclude the idea that an unused right of way could be taken without compensation. If there is any serious doubt about the construction of the Act, then we must resort to the title to determine the legislative intent. (*Bradford* v. *Jones*, 1 Md. 351.) The title of this Act declares in terms that it is intended to provide "for the use by any other railroad company of the abandoned or unused rights of way or locations of railroad companies."

The whole contention of the plaintiff is based upon the theory of a forfeiture of our title and the right on their part to take without compensation, despite our expressed intention by word and by act not to abandon our property.

As to the evidence relied upon: (*a*) Non-user for a period of fifteen years. (*b*) The reports of the president and directors of the defendant company. (*c*) The agreement entered into with the Baltimore Belt Railroad Company.

The non-user does not alone work an abandonment, or prove the intention to abandon. To work an abandonment there must be a concurrence of intention to abandon and actual relinquishment. 1 *Cyclopedia Law & Procedure*, pp. 4, 5, 6; *Hummell's case*, 175 Penn. St. 537; 142 N. Y. 176; 29 Iowa, 276–80; 37 Ind. 294–8; 95 Wis. 29; 140 Ill. 438–45.

If the interest of the railroad company in the strip of ground under the condemnation which gave it the "use and occupa-

tion in perpetuity" be a mere casement, a declaration of inten-
tion to abandon is not sufficient to prove abandonment, and if
acts *in pais* be relied on they must be of a decisive character.
Those acts whether of omission or commission, to work an
abandonment, depend upon the intention at the time.    *Vog-
eler* v. *Giess,* 51 Md. 410; *Washburn on Easements,* 2 ed.,
secs. 551, 553, 554; 1 *Wood's Railway Law* (ed. of 1885),
p. 716; *Eddy* v. *Chase,* 140 Mass. 471.

If the "use and occupation in perpetuity" acquired by the
appellee under the condemnation is to be construed as a title
in fee, then the question arises, can there be vested in anyone
a sufficient title to justify an action of ejectment, by the own-
er's abandonment, at common law.    1 *Cyclopedia of Law &
Procedure,* p. 6; 3 *Washburn on Real Property,* pp. 60–65,
(3 ed.)

The appellee contends that its interest in the land is of a
higher nature than a mere easement.    It is more in the nature
of an ownership in perpetuity.    A railroad by condemnation
exercises all the rights of exclusive ownership in land taken
under such proceedings as here.    *Peet's case,* 152 Penn. St.
488–92; *Hard's case,* 25 Vt. 116.

To understand the weight and effect of the report of the R.
R. Co. and the traffic agreement we must first get a correct
understanding of the condition of the railroad company, its
projects, purposes, etc.

The Philadelphia Branch of the road was being built under
the original charter, Acts of 1826, ch. 226, which gave au-
thority to build branches, but no authority to build an ele-
vated road through Baltimore or lateral branches from a
branch.    The elevated road or Pratt street line was determ-
ined upon and an empowering Act was obtained, Acts of
1884, ch. 233, which fixed the route for such elevated struc-
ture from Henrietta street, Camden station, to Canton in Bal-
timore County.    The road was being built between Philadel-
phia and Baltimore to a point near the city, known as Bay-
view Junction.    The projected line via Pratt street, authorized
by the Act referred to, was a very costly undertaking and one

that would require much time, and it was determined to adopt a cheap route that could be early completed to connect the company's lines at Locust Point, and thence by a ferry at Canton with its Philadelphia extension at Bayview Junction. For the construction of this temporary and altogether insufficient line of connection, involving a branch of a branch, the company procured another Act from the Legislature of 1884, it being ch. 232, authorizing the construction of a branch connected with its Philadelphia branch. This ferry route branch was no permanent part of the Philadelphia branch of the Baltimore and Ohio, but a branch of that branch adopted for immediate use. The company purchased a good deal of property for its Pratt street elevated line in the city, and did some work on it, and also secured by condemnation and purchase a good deal of property for its Philadelphia branch proper, including the land involved in this suit, upon which some grading and masonry was done. At this time the financial troubles of the Baltimore and Ohio came, resulting in a receivership, but prior to this result, the Belt Line Railroad Company had been organized for the construction of an underground road through the city and the Baltimore and Ohio, in view of the financial difficulties which put off the building of its road through the city, availed itself of the opportunity to secure a passage through Baltimore without the expenditure of any money by a traffic contract with the Baltimore Belt Railroad Company. This traffic contract is relied upon by appellant as an act showing a relinquishment of title to the ground in question.

In the light of these facts, which will be made somewhat clearer by the maps, the Court will see that the report to the stockholders in 1890 did not refer at all to the Pratt street line, of which the land in question is a part, but to the temporary and wholly inadequate ferry route constructed under the power given by ch. 332, Acts of 1884, of which route the land in question formed no part. And so with the report of 1895, which says in terms: "The *water* transfer from Locust Point to Canton was in August last abandoned." The land

involved here was no part of that line at all, but is distant a mile or more from it, and, as stated, a part of a different line.

It is true the Baltimore and Ohio agrees by the third clause of that agreement to cause all of its traffic to be shipped over the Belt Road, but the fourth and fifth clauses of the agreement show the objects and purposes of the undertaking, viz., sufficient at the rates fixed to pay 5 per cent interest on the Belt Company's bonds.  This agreement could be enforced for the purposes for which made and by the interests in whose behalf made.  Would this agreement be construed to require the Baltimore and Ohio to send more traffic over the road than would suffice for this purpose?  We find from the testimony of Mayer that when this agreement was made, the Baltimore and Ohio Railroad Company did not own a share of stock of the Baltimore Belt Line Railroad Company, but subsequently acquired the whole of it, thus protecting itself against any enforcement of that contract except by the bondholder.

When the tunnel was constructed ten years ago, it was doubtless supposed to be large enough to admit of the passage of the largest cars and engines to be used.   The evidence shows, that cars are now being built by other companies and routed by the Baltimore and Ohio of such dimensions that they cannot be passed through the tunnel and have to be taken over the water or ferry route.

The evidence shows that the Belt Line is now taxed to its fullest capacity, the traffic of the Baltimore and Ohio is increasing rapidly, and other means of passing through the city will have to be adopted ; that the Pratt street route, including the land here involved, is by far the best and shortest; that under the new management of the Baltimore and Ohio, its financial condition has improved and surveys and locations for the Pratt stree route have been and are being made.  We thus see that the land condemned and sought to be taken from us will, in no long time be used for the identical purpose for which taken.   Would it not be a strange law that allowed a land owner who had been paid five times over for his land to get

the land itself away from us without re-payment, because our financial difficulties had temporarily embarrassed us in using it?

PAGE, J., delivered the opinion of the Court.

This is an appeal from the judgment of the Circuit Court for Baltimore County rendered in an action of ejectment brought by the appellant to recover possession of a strip of land which had been condemned by the appellee for railroad uses in 1885.    Two exceptions were taken, one to the admission of evidence, the other to the action of the Court upon the prayers.

The appellant to sustain its case offered in evidence, among other things, the proceedings whereby the land in question was condemned for the use of the appellee for the construction of its Philadelphia Branch Railroad, intended to be a connecting line of the Baltimore and Ohio Railroad Company, from its Station on Camden street down and along Pratt street and Eastern avenue to the city limits, and thence to its yards at Bayview.   The appellee paid to the appellant the damages awarded amounting to $20,000, and entered into the possession of the property, but has made no further use of it than laying on it rails, which did not connect with its other tracks and which were removed in 1898, without having been employed for any substantial use.   In 1886 the Philadelphia Branch of the appellee was opened for business, but instead of following the route over this property for its connection with the main stem, a temporary line over other land to the ferry to Locust Point, was made use of until the year 1895, when the ferry line was discontinued for general business, and the connection was then made *via* the tunnel under Howard street over the tracks of the Belt Line Company.   In 1890, that company entered into an agreement with the appellee whereby it was stated that the Belt Line Company being about to construct a railroad from Camden station at a point of connection with the tracks of the main stem of the appellee at Hamburg street, midway between Howard and Eutaw streets, to a point of connection with the tracks of the Philadelphia Branch of the

appellee, at the western end of the Bayview yard ; and it being desired by the parties that the appellee should enjoy the use of these tracks, &c., when completed—therefore it was agreed among other things that as soon as the said railroad was constructed, the appellee should have the right to use the same ; and in part consideration thereof the appellee stipulated to ship and cause to be transported and carried over the Belt Line during the continuance of the agreement all of its traffic of every kind passing through the city of Baltimore, &c., except such part thereof as was loaded at, or destined for, stations of the appellee on or adjacent to the water, or destined to or from Canton.    Much of this, as well as other evidence, was offered for the purpose of showing that the appellee had abandoned the projected line across the land now in controversy, by reason whereof it was contended that the right of occupancy thereof had reverted to the appellant.

The appellee, with a view of showing that the appellee had not intended to abandon the route across the lands in question, offered evidence tending to prove the circumstances attending the agreement with the Belt Line Company and the reason for not having yet completed the Pratt Street Branch. One of its witnesses in the course of the examination was asked by the counsel for the appellee whether in his judgment it would be proper for the appellee to abandon definitely its projected line through the city, to which the witness replied that he would consider it "a very unwise thing to do," and proceeded to give the grounds therefor; which substantially were that the capacity of the tunnel was now taxed to the utmost, and the business was still growing, and as soon as the capacity of the tunnel proved inadequate, the freight traffic would have to go over the Pratt street line "or some line substituted for it."    The counsel for the appellee thereupon remarked, "that is just what I wanted."    Objection was made to the question and answer, and this being overruled exception was taken to the ruling of the Court, as well as to the remark of counsel ; and this constitutes the appellant's first exception.    With respect to the exception to the remark of coun-

sel, there was no ruling of the Court below and therefore nothing for this Court to pass upon.

The question objected to was put to a witness who was an expert in railroad matters respecting a fact pertinent to the inquiry then being made.   For reasons that will appear hereafter it was competent for the appellee to show all the facts and circumstances affecting the question of abandonment. The theory of the appellant in objecting to this question and answer is stated in its several prayers, all of which were refused by the Court.   In its first and third prayers, it is substantially affirmed, that if the appellee made the agreement with the Belt Line Road in 1890, and since then has transported its freight and passenger traffic, from its main stem to the Philadelphia division, over the line of that company, and not over the land in dispute; and (by its third prayer), if the appellee has adopted another and different route and has never completed its railway over the land in question; then there was an abandonment of the rights of the appellee acquired by the condemnation; and in such case, the property has reverted to the appellant, and it has the right to recover the possession thereof. So that the question raised by this exception and these prayers is whether the specific intention of the appellee with respect to an abandonment of the land under the circumstances of this case is a material matter; or whether it must be conclusively presumed in this case as matter of law that there was an abandonment of the property by the appellee; and this is made to depend upon two facts, viz., *first*, the non-completion of the road over the land or a non-user of the property for the purposes of the Philadelphia Branch; and *second*, that since the condemnation proceedings, the traffic of the appellee has been sent over the Belt Line Road; if these facts were found by the Court sitting as a jury, then there was a reversion of the property to the plaintiff, and the plaintiff would be entitled to recover.

It seems to be well settled that when a corporation under condemnation proceedings "acquired for public purposes a *mere* easement in land, its right and title to the property so ac-

quired are dependent upon the use of the property for public
·purposes, and when such public use becomes *impossible*, or is
abandoned its right to hold the land ceases, and the property
reverts to its original owner." Many of the authorities to
.sustain this proposition are to be found cited in 10 *A. & E.
Enc. Law* (2 ed.), 1198; *Lewin on Eminent Domain*, sec. 596.

 Here the condemnation was, "for the use and occupation in
*perpetuity* by said company of said parcel of land for its Phila-
phia Branch Railroad," and the damages of $20,000 assessed,
and paid by the appellee were assessed for that purpose, and
no other. To deprive it now of the possession of the land for
that purpose, there must be shown that it has lost its right,
either by reason of the fact that such use having become im-
possible (which is not contended), or that by some act, or the
omission of some act, it was bound to perform, the appellee
must legally be regarded as having abandoned it. It would
appear to be entirely unreasonable to hold that a mere non-
user could have that effect; because to so hold, would make
it impossible for a corporation to make any provision for the
future by securing more property than was then required but
would be needed thereafter. Nor ought the mere fact that
another route has been established be sufficient *per se;* since
.that would prevent a railroad from acquiring two routes, hav-
ing the same terminals. It is certainly conceivable that a rail-
road company might deem it advisable to take under con-
demnation proceedings more or other property than it could
then use. Or having taken it for present uses, it might be-
come financially embarrassed, so that their plans would have
to be postponed. In such cases it should not be held that
while it is awaiting developments of its business, or the re-
establishment of its financial ability, it must lose whatever
expenditures it may have incurred in the acquirement of prop-
erty, which for the present cannot be made use of, but are
absolutely necessary for the carrying out of their plans. In
*Pittsburg, F. W. & C. Ry. Co.* v. *Peet*, 25 Atl. Rep. 612, (19
L. R. A. 467), the Court said: "When a railroad company
condemns land, it is of necessity the judge of how much is re-

quired for its use; the company had a right, when it condemned the property to regard and. make provision for its future as well as its present needs." It has accordingly been frequently held, that while non-user, is strong evidence tending to show abandonment, yet it will not *per se* operate as abandonment, unless there is some decided and unequivocal act of the owner inconsistent with the continued existence of the easement; or unless, the non-user has been for a considerable period, without a valid reason or excuse for its neglect. *Eddy* v. *Chase,* 140 Mass. 471; *People* v. *Albany, &c., R. R. Co.,* 24 N. Y. 261.

This Court in *Vogler* v. *Geiss,* 51 Md. 410, has said that while a party entitled to a right of way or other mere ease-ment in the land of another may abandon and extinguish such rights by acts *in pais,* and without deed or other writing; yet that such acts relied on to effect such result "must be of a decisive character;" and whether they amount to an abandon-ment or not, "depends upon the intention with which it was done and that, is a subject for the consideration of the jury. A cesser of the use, coupled with any act clearly indicative of an intention to abandon the right, would have the same effect as an express release of the easement, without any reference whatever to time." And this seems to be in accordance with authority as well as reason. In 2 *Wood on Railroads,* sec. 242 (ed. 1894), the principle is thus stated : "The question as to whether there has been an abandonment or not, is usually one of fact, to be determined by the circumstances in each case; and a mere non-user for a long time less than the period prescribed in the Statute of Limitations, as in one case thirteen years, is not sufficient to establish an abandonment." *Barlow* v. *Chicago, &c., R. R. Co.,* 29 Iowa, 276.

So a change of route is strong evidence of an abandonment of the old way, and in some cases has been held, under the then existing circumstances, to amount to an abandonment. *Comm.* v. *Cambridge,* 7 Mass. 163; *Comm.* v. *Westborough,* 3 Mass. 406; *Stacey* v. *Vermont Central Railroad,* 27 Vt. 39.

If the new route be attended by circumstances showing that the change is but temporary, or that it is not in fact in-

tended for an abandonment of the old route, but to secure additional accommodation for its business, or there are other acts showing a want of intention to abandon, there is no good reason why as matter of law it should be so regarded.   *Chicago R. R. Co.* v. *Bean*, 69 Iowa, 257.

In the case of *The Roanoke Inv. Co.* v. *The Kansas City Ry. Co.*, 108 Mo. 66, where there was a change of route, the Court laid stress upon the "intention" to be gathered from all the facts of the case.   It held that the "intention" to abandon was clear, not only from the declarations of the officers, but because it had adopted a different route, a fact of most "positive, unequivocal evidence of an intention."   *Commonwealth* v. *Boston &c., R. R. Co.*, 150 Mass. 174.

It seems therefore clear, that in this case, as indeed all others, abandonment is a relinquishment or surrender of rights by one person to another and includes both the intention to abandon and the external act by which the intention is carried into effect.   I *Am. & Eng. E. of Law*, p. 2; *The City of Columbus* v. *The Columbus & Shelby R. R. Co.*, 37 Ind. 299; *Durfee* v. *The Peoria, &c., Ry. Co.*, 140 Illinois, 439; *Barlow* v. *Chicago Rock Island & P. R. R. Co.*, 29 Iowa, 276; *Roby* v. *N. Y. C. & H. R. R. Co.*, 142 N. Y. 180–181.

It follows from what has been said the appellant's third prayer was properly rejected.

The appellant's first and fourth prayers found the plaintiffs right of recovery solely upon the finding by the Court sitting as a jury, of the agreement with the Belt Line Railroad Company, and that in accordance therewith the appellee carries and has carried since the year 1895, all its traffic over that line from its main stem to the junction with the Philadelphia Branch, and that none of its traffic has passed over the land in dispute.   These prayers do not permit the jury to make inquiry as to the actual intention of the appellee to abandon the route over the disputed land ; but in substance affirm that the contract and the mode of transporting the traffic as stated in the prayers, are of such a character that an intention to abandon must be legally presumed.

It must be noticed that these facts do not prove a change of route, of a character similar to that shown in the cases cited by the appellant, where the alteration of the route consisted in a change of the line in such a manner as to import as matter of fact a strong, if not necessary, implication that the old way was to be abandoned. In fact in this respect there was no such change of route at all. It is shown by the proof that after condemning and buying the property along Pratt. street and elsewhere along the proposed route, financial difficulties compelled the appellee to postpone completing the Pratt street line. An opportunity arose by which it was enabled to secure a means of transporting its traffic over the property of another corporation. It was by means of a traffic arrangement that the appellee became financially able to secure this. At that time the appellee owned none of the stock of the Belt Line company, and it was not until a later period that it became the owner of its stock or a majority of it. The implication to be deduced from an arrangement like this cannot be similar to that to be derived from a change of line, which *per se* creates a reasonable belief that the company has no further use for and does not intend to use the old line. Here, the character of the transaction is this; the appellee finding itself financially embarrassed, and therefore unable at that time to complete its projected plan of connection with the Philadelphia Branch, enters into a contract by which it acquires traffic accommodation over another road. Surely it cannot be contended with success that this act alone carries with it a legal implication, not rebuttable by other facts, that there was an intention to abandon its own line as being thereafter wholly valueless. But it is further contended that the character of the contract shows that it was the intention of the appellee to abandon the Pratt street line; from the fact that the appellee stipulated to ship over the Belt Line, "all its traffic of every kind passing through the city of Baltimore" and has since done so. A careful examination of the entire contract shows that the purpose of that provision was to secure to the Belt Line the necessary funds with which to take care of the bonds

issued and to be issued by the Belt Line in the performance of its obligations under the contract.

The appellee by the contract was to furnish such amount of transportation of its own traffic as with the sums received from other companies, at the rates named, would amount to certain sums named; and if there was a deficiency the appellee was to make it good to the extent of the annual interest on the bonds issued by the Belt Line Company.

The stipulation that the appellee should send all its traffic over the Belt Line cannot under all the circumstances be regarded as tantamount to an expression of an intention to abandon its Pratt street route, or as a stipulation that it should not avail itself of other means of transportation, it then had or might thereafter have, of all such traffic as for any reason could not pass through the tunnel, along Howard street, or was in excess of the capacity of the tunnel to carry. The appellee at the time this agreement was made, though then in financial difficulties, was an important line of transportation, with great possibilities in respect to freight and passenger transportation. Its officials must have expected that its business would increase until it should be beyond the capacity of the Belt Line. It cannot be imagined therefore that by these stipulations it intended to preclude itself from availing itself of other avenues for transporting such traffic as for *any* reason the Belt Line could not take care of, or to abandon a route on which much money must have already been expended. The evidence shows that the capacity of the Belt Line route has almost reached its limit, and when that has been exceeded the appellee must look to the Pratt street or some other route to accommodate the excess.

For these reasons the appellant's first and fourth prayers were properly rejected.

The appellant's second prayer also rejected below announced as a correct legal proposition, that the Court sitting as a jury should find the right of way was abandoned by the defendant, if it finds that the property has remained unused for ten or more years after such condemnation." This prayer

involves the construction of the Act of 1890, ch. 220, which is as follows : "Whenever upon an unfinished railroad a right of way or location on any part thereof remains for ten years unused for railroad purposes, the same shall be held to be abandoned, and shall be liable to be used and appropriated by another railroad company upon purchase or condemnation in the manner provided in this article."

We do not think its provisions apply to the case now under consideration. Here it is claimed that by non-user of the property, the right of possession has reverted to the owner of the fee. The purpose and effect of the Act does not work this result. Its purpose was to give power to a railroad company to secure by condemnation, a right of way upon an unfinished railway, which has been disused for railroad purposes for ten or more years; and for that purpose it should be held to be abandoned. This appears not only from the terms of the Act, but also from its title where it is stated to be an Act "providing for the use of any other railroad company of the abandoned or unused rights of way or location of railroad companies." The word "abandoned" in the connection in which it is used cannot import such abandonment as would cause a reversion to the first owner; for the reason that such a construction would be to take from the railroad company property obtained by condemnation and paid for, without compensation, and therefore raise a constitutional question not necessary for us now to decide. Its more reasonable construction would be, that it is to be applied to cases only where there has been no use of the property for railroad uses; and in such a case there has been such an abandonment, that authority is granted to another railroad company, to take condemnation proceedings to secure it for its use, without further special legislative permission so to do. This would be within the legislative power. "It rests with the Legislature to determine when the necessity arises for making one public purpose subordinate to another." It cannot however bestow the property of any person natural or corporate upon another," but the Legislature may determine when it may be taken for public purposes. *Turnpike Co.* v. *Railroad Co.*, 81 Md. 257.

This Act therefore merely authorizes a railroad to take by condemnation property which has been unused for railroad purposes for ten or more years upon an unfinished railway. It does not however attempt to deprive the owner of any of its interests in. the property, without proceedings in condemnation and the payment of such damages as the jury may award.    This prayer was therefore properly rejected.

It follows also from what has been said that the second prayer of the appellee was properly granted.

Finding no error the judgment will be affirmed.

*Judgment affirmed.*

(Decided March 23rd, 1904.)